UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREGORY A. GRICE, III,

Plaintiff,

   -against-

TOWN OF GREENBURGH, NEW YORK, THE
TOWN OF NORTH CASTLE, NEW YORK, COUNTY OF
WESTCHESTER, METROPOLITAN TRANSPORTATION
AUTHORITY, DEREK HOSEIN, Individually, MICHAEL
ALFALLA, Individually, KENNETH STEWART, Individually,
DONALD HEAGLE, Individually, KEVIN MADDINE,
Individually, JONATHAN PISCATELLI, Individually, MICHAEL
SACHAR, Individually, ANTHONY MCVEIGH, Individually,
FRANK FARINA, Individually, MARK DELIA, Individually,
HERMAN KILLEBREW, Individually, ROBERT BARNETT,
Individually, THOMAS MCCORMACK, Individually, JOSEPH
HORESKY, Individually, KATHLEEN CRISTIANO, Individually,
BRIAN SCOTT, Individually, JAMES LUCIANO, Individually,

Defendants.

No. 13-cv-1776 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

   Plaintiff Gregory A. Grice, III asserts claims against the Town of Greenburgh, New

York; the Town of North Castle, New York; the County of Westchester Metropolitan

Transportation Authority; Derek Hosein; Michael Alfalla; Kenneth Stewart; Donald Heagle;

Kevin Maddine; Jonathan Piscatelli; Michael Sachar; Anthony McVeigh; Frank Farina; Mark

Delia; Herman Killebrew; Robert Barnett; Thomas McCormack; Joseph Horesky; Kathleen

Cristiano; Brian Scott; and James Luciano arising out of his arrest on June 6, 2011.

   Pursuant to this Court's orders of September 5, 2014 and order of October 8, 2014,

Plaintiff's claims as against the Metropolitan Transit Authority, Derek Hosein, Michael Alfalla,

Kenneth Stewart, Donald Heagle, Kevin Maddine, Jonathan Piscatelli, Michael Sachar, the Town

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/7/2015

of North Castle, Robert Barnett, Thomas McCormack, Joseph Horesky, the County of Westchester, Kathleen Cristiano, Brian Scott, and James Luciano were dismissed pursuant to Rule 41 of the Federal Rules of Civil Procedure.  *See* ECF Nos. 89, 90, 93.

Before the Court are motions for summary judgment submitted by (i) the Town of Greenburgh and (ii) Anthony McVeigh, Frank Farina, Mark Delia, and Herman Killebrew (the "Officer Defendants").  For the following reasons, both motions are DENIED.

## BACKGROUND

On June 6, 2011, Plaintiff, a sixteen-year-old male, was travelling home from school at approximately 3:30 p.m.  (Officer Defs.' Rule 56.1 Statement ("Officer Defs.' 56.1") ¶ 2, 6.) Plaintiff was wearing a red shirt and a New Jersey Transit baseball cap; carried a cellphone in a holder attached to the waistband of his pants; and wore a backpack containing a Metropolitan Transit Authority ("MTA") rule book, camera, and scanner.  (*Id.*)  Plaintiff had purchased the scanner from Radio Shack, and it was pre-set to pick up police frequencies.  (Plaintiff's Response to Defendants' Local 56.1 Statement ("Pl.'s 56.1") ¶ 3.)  The MTA rule book was intended for Metro-North employees and detailed the location of certain Metro-North interlockings, yards, and information regarding railroad equipment.  (Officer Defs.' 56.1 ¶ 3.) Plaintiff walked for approximately one hour until he arrived at the railroad crossing near Virginia Road (the "Virginia RR Crossing").  (*Id.* ¶ 7.)

After arriving at the Virginia RR Crossing, Plaintiff placed his backpack against a concrete barrier approximately five to ten feet from the railroad tracks.  (*Id.* ¶ 8.)  Plaintiff then removed the camera and scanner from the backpack.  (*Id.*)  Plaintiff turned on the scanner, which broadcast the communications of Metro-North employees communicating their positions to one another.  (*Id.* ¶ 9.)  Plaintiff then began taking photographs of the train tracks, remaining

approximately twelve to fifteen feet away from the tracks and monitoring the Metro-North communications on his scanner.  (*Id.* ¶ 10.)  Plaintiff also turned on the audio recording feature of his cell phone to capture the train horns.  (*Id.*)

On June 6, 2011—the same day—Mary Andrachick called the communications unit of the Greenburgh Police Department and spoke with Dispatcher Donald Baretta.  (*Id.* ¶ 11.)  Ms. Andrachick informed Dispatcher Baretta that she had observed a man of "mix race" "on the train tracks" wearing a "red shirt" with a "little controller."  (Declaration of Brett H. Klein ("Klein Decl."), Ex. 6 1:12, 1:17–18, 2:3–10.)  Ms. Andrachick's call with Dispatcher Baretta was recorded on the police dispatch log.  (Officer Defs.' 56.1 ¶ 11.)

Sergeant Anthony McVeigh, a commanding officer of the Special Operations Unit, was in a marked north end Greenburg police vehicle unit 133 when he picked up a call dispatched to the north end units regarding Plaintiff's presence near the Virginia RR Crossing.  (*Id.* ¶ 12.)  In particular, the dispatcher relayed that there was a white male wearing a red shirt bent down near the train tracks holding a remote control object.  (Pl.'s 56.1 ¶ 12.)

Two months prior to this incident, the Greenburgh Police Department distributed a flyer detailing a failed terrorist attack at the railroad crossing in Patterson, New York (the "May 2011 Roll Call Release").  (Officer Defs.' 56.1 ¶ 12.)  The May 2011 Roll Call Release indicated that terrorist threats to mass transit were a "big concern" post-9/11 and that as of February 2010, members of al-Qa'ida were allegedly considering attacks against railroads.  (*Id.*)

Sergeant McVeigh arrived at the Virginia RR Crossing minutes after receiving the dispatch.  (*Id.* ¶ 13.)  Sergeant McVeigh parked his vehicle away from the tracks and approached Plaintiff, who was facing southward as a northbound train approached.  (*Id.*)  Sergeant McVeigh observed that Plaintiff was wearing a red shirt and a baseball cap.  (*Id.* ¶ 14.)  Plaintiff's scanner

was on the concrete barrier near the train tracks.  (Pl.'s 56.1 ¶ 14.)  As Sergeant McVeigh got closer to Plaintiff, he stated to Plaintiff, "keep your hands where I can see them" and inquired as to what Plaintiff was doing.  (*Id.* ¶ 16.)  Plaintiff informed Sergeant McVeigh that he was taking pictures of the trains and using the scanner to listen to trains.  (Klein Decl., Ex. 11 at 2:8–23.)  Sergeant McVeigh asked Plaintiff whether he had anything he was not supposed to have and whether he was in possession of any weapons, and Plaintiff responded in the negative to both questions.  (*Id.* at 2:24–3:9.)  Sergeant McVeigh informed Plaintiff that the Greenburgh Police Department had received a "complaint" about Plaintiff.  (*Id.* at 3:24–25.)  Plaintiff informed Sergeant McVeigh that he was a "rail fan."  (*Id.* at 5:20.)  Sergeant McVeigh told Plaintiff to keep his hands where he could see them and searched Plaintiff.  (Pl.'s 56.1 ¶ 17.)

Next, Sergeant McVeigh informed Plaintiff that for his safety and Plaintiff's safety, he was going to put Plaintiff in handcuffs.  (Klein Decl., Ex. 11 at 6:10–14.)  Sergeant McVeigh then handcuffed Plaintiff by the concrete barrier.  (Officer Defs.' 56.1 ¶ 20.)  Plaintiff informed Sergeant McVeigh that he "didn't do anything [he] wasn't supposed to do."  (Klein Decl., Ex. 11 at 8:18–20.)  With Plaintiff's permission, Sergeant McVeigh searched Plaintiff's backpack and discovered an email from the MTA informing Plaintiff that he had permission to take photographs of trains so long as he was not on MTA property.  (Officer Defs.' 56.1 ¶ 21.)  While Plaintiff was in handcuffs, Sergeant McVeigh asked Plaintiff certain background questions, including his address, date of birth, and the school he attended.  (*Id.* ¶ 22.)  Shortly thereafter, additional officers began to arrive at the scene, including Police Officer Herman Killebrew, Police Officer Mark Delia, and Lieutenant Frank Farina.  (*Id.* ¶¶ 23, 24, 28.)  The communications unit of the Greenburgh Police Department contacted the MTA police since the Virginia RR Crossing is MTA property.  (*Id.* ¶ 28.)

4

During his deposition in this action, Lieutenant Farina testified that Plaintiff was kept in handcuffs while the officers could fully investigate the situation and ascertain whether Plaintiff tampered with the railroad in any way.  (*Id*. ¶¶ 29–30.)  Additionally, Lieutenant Farina attempted to contact the female motorist who called in the initial tip regarding Plaintiff's presence at the Virginia RR Crossing but was unable to reach anyone.  (Pl.'s 56.1 ¶ 30.)

At approximately 6:00 p.m. on June 6, 2011, the MTA received a call from the Greenburgh Police Department that there was a suspect reported to have been kneeling on train tracks.  (Officer Defs.' 56.1 ¶ 31.)  MTA police officers Kevin Maddine and Derek Hosein arrived at the Virginia RR Crossing, followed by Sergeant Donald Heagle and Officer Jonathan Piscatelli.  (*Id*. ¶¶ 31–32.)  Plaintiff was still in Sergeant McVeigh's custody upon Sergeant Heagle's arrival.  (*Id*. ¶ 33.)  Sergeant McVeigh informed Sergeant Heagle that the Greenburgh Police Department had responded to a report concerning someone on the railroad tracks.  (Pl.'s 56.1 ¶ 33.)  During his deposition, Sergeant Heagle testified that someone at the scene informed him that there may be a device on the train tracks.  (Officer Defs.' 56.1 ¶ 34.)  MTA Officer Hosein notified Sergeant Heagle that he recognized Plaintiff as a rail enthusiast.  (*Id*. ¶ 37.)  Following an officer and canine search of the tracks at Virginia RR Crossing and when Sergeant Heagle confirmed there was no device on the tracks, Plaintiff was turned over to the MTA Police Department after it was determined Plaintiff would be summonsed for trespass.  (Pl.'s 56.1 ¶¶ 38–39.)   Sergeant McVeigh removed his handcuffs from Plaintiff, and MTA Officer Hosein placed his handcuffs on Plaintiff.  (Officer Defs.' 56.1 ¶ 39.)  Altogether, Plaintiff was detained in Sergeant McVeigh's handcuffs for approximately 45–50 minutes.  (*Id*.)

When Sergeant McVeigh and Officer Delia returned to police headquarters, Officer Delia prepared an incident report, or a UF-32 report.  (*Id*. ¶ 43.)  Sergeant McVeigh prepared a

supplemental report.  (*Id.*)  Meanwhile, Plaintiff was transported in handcuffs by members of the MTA to the MTA police precinct in Mount Vernon.  (*Id.* ¶ 44.)  Upon his arrival, Plaintiff was placed in a holding cell.  (*Id.*)  Plaintiff was questioned by MTA police at the precinct, and his mother arrived to pick him up.  (*Id.* ¶ 45.)

With regards to this incident, Plaintiff appeared in court on three occasions and was eventually granted an adjournment in contemplation of dismissal.  (*Id.* ¶ 47.)  Six months after the adjournment, the trespass charge was dismissed.  (*Id.*)

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party also may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order).  Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor."

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal

quotation marks omitted).  In reviewing the record, "the judge's function is not himself to weigh

the evidence and determine the truth of the matter," nor is it to determine a witness's credibility.

*Anderson*, 477 U.S. at 249.  Rather, "[t]he inquiry performed is the threshold inquiry of

determining whether there is the need for a trial."  *Id.* at 250.

## DISCUSSION

### I.    Claims Voluntarily Withdrawn

At the outset, the Court notes that Plaintiff voluntarily withdraws a number of claims

against the individual defendants and the Town of Greenburgh.  In his brief in opposition to the

Officer Defendants' motion for summary judgment, Plaintiff withdraws his claims alleging

malicious abuse of process (third cause of action), substantive due process rights (fourth cause of

action), and violation of equal protection rights (fifth cause of action).  (Pl.'s Opp. at 27–28.)

Additionally, Plaintiff withdraws the following state law claims: malicious abuse of process

(twelfth cause of action); intentional infliction of emotional distress (thirteenth cause of action);

negligent screening, hiring, and retention (fourteenth cause of action); negligent training and

supervision (fifteenth cause of action); negligence (sixteenth cause of action); violation of New

York Constitution Article 1 § 11 (eighteenth cause of action); and violation of New York

Constitution Article 1 § 12 (nineteenth cause of action).  (Pl.'s Opp. at 1, n.1.)  Plaintiff also

withdraws his claims as against Mark Delia and Herman Killebrew.  (Pl.'s Opp. at 1, n.1.)

Finally, Plaintiff withdraws his claim for municipal liability as against the Town of Greenburgh.

(Memorandum of Law in Opposition to Defendant Town of Greenburgh's Motion for Summary

Judgment ("Pl.'s Town Opp.") at 8.)

II.     **False Arrest Claims (Second and Ninth Causes of Action)**

Plaintiff's second and ninth causes of action assert claims for false arrest under federal law and New York state law, respectively.  "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).  Therefore, the analysis of the federal and state law claims is identical.  For plaintiff to prevail on either claim, he must demonstrate "that the defendant intentionally confined him without his consent and without justification."  *Weyant*, 101 F.3d at 852 (citation omitted).  "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest'" under both New York state law and Section 1983.  *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

"Probable cause requires an officer to have 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'"  *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)).  "Probable cause does not require absolute certainty[,]"*Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003), and "[c]ourts should look to the 'totality of the circumstances' and 'must be aware that probable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts– not readily, or even usefully, reduced to a neat set of legal rules.'"  *Panetta*, 460 F.3d at 395 (quoting *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir. 2002)).

A.  **The Officer Defendants Had Reasonable Suspicion to Stop Plaintiff**

Even if an officer lacks "probable cause," an officer may still detain an individual "for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that

8

criminal activity 'may be afoot . . . .'"—otherwise known as a "*Terry* stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  With respect to ascertaining whether an officer has reasonable suspicion, "the proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing." *United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990) (citing *Sokolow*, 490 U.S. at 8; *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The inquiry is an objective one—"the subjective intentions or motives of the officer making the stop are irrelevant." *Floyd v. City of New York*, 861 F. Supp. 2d 274, 288 (S.D.N.Y. 2012) (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)).  Nevertheless, officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 418).

The Officer Defendants contend that they had reasonable suspicion of Plaintiff's potential criminal activity based upon (i) the May 2011 Roll Call Release (issued less than two months prior to the events underlying Plaintiff's claims) regarding possible attacks by al-Qa'ida at mass transit sites; (ii) Ms. Andrachick's telephone tip; (iii) and Sergeant McVeigh's corroboration of Ms. Andrachick's telephone tip.  (Officer Defs.' Mot. at 2–9.)  Plaintiff argues, on the other hand, that Sergeant McVeigh's sole reliance on an anonymous tip cannot give rise to reasonable suspicion.  (Pl.'s Opp. at 10–12.)

The Court first must resolve the dispute as to whether Ms. Andrachick's phone call constitutes an anonymous tip.  "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams*

9

*v. Williams*, 407 U.S. 143, 146–47 (1972), 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.'" *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (quoting *Alabama v. White*, 496 U.S. 325, 329 (1990)). "Accordingly, an anonymous tip, unless suitably corroborated, does not ordinarily carry sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop." *Marinis v. Vill. of Irvington*, 212 F. Supp. 2d 220, 222 (S.D.N.Y. 2002) (internal citations omitted).

Plaintiff correctly points out that "only the information actually conveyed to an officer by a dispatcher" can form the basis for a reasonable suspicion. (Pl.'s Opp. at 12); *see United States v. Colon*, 250 F.3d 130, 134–35 (2d Cir. 2001) (holding information known by 911 operator, but not transmitted to police officer, will not be imputed to police officer). In that vein, Plaintiff contends that the 911 dispatcher failed to convey the telephone tipster's identity and phone number, which effectively renders the telephone tip anonymous for purposes of the officer's knowledge. (Pl.'s Opp. at 13.) However, the Officer Defendants, in their reply brief, clarify that the 911 dispatcher, Donald Baretta, informed Lieutenant Farina of the identity and the phone number of the telephone tipster. (Officer Defs.' Reply at 1) (citing Klein Decl., Ex. 6 at 16:4–24, 17:1–2.) It is undisputed that Lieutenant Farina's knowledge of the telephone tipster's identity and phone number is imputed to the other Officer Defendants. *See Colon*, 250 F.3d at 135 (collective knowledge doctrine).

Since the identity of the telephone tipster was known to the Defendant Officers, the information provided by Ms. Andrachick carries "a peculiar likelihood of accuracy" because she had "no apparent motive to falsify." *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975); *Caldarola v Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002) (same). Ms. Andrachick relayed that she observed a white male wearing a red shit and baseball cap near the train tracks at the Virginia

RR Crossing in possession of a remote control device. (Klein Decl., Ex. 6 1:12, 1:17–18, 2:3–10.) After receiving a radio call from the Greenburgh Police Department transmitting the substance of Ms. Andrachick's tip, Sergeant McVeigh travelled to the Virginia Road railroad crossing. (Officer Defs.' 56.1 ¶ 13.) Once there, Sergeant McVeigh observed a male wearing a red shirt and a baseball cap—nearly matching Ms. Andrachick's description.[1]

Moreover, Sergeant McVeigh's reasonable suspicion that Plaintiff was engaged in criminal activity was not premised upon his confirmation of the accuracy of Ms. Andrachick's tip alone. Plaintiff was situated within 12-15 feet of railroad tracks—in close proximity to an electrified third rail—near a backpack and scanner. (Officer Defs.' 56.1 ¶ 13–14.) Additionally, the May 2011 Roll Call Release, which was issued not even two months prior to this incident, notified members of the Greenburgh Police Department of potential terrorist threats at mass transit sites. (*Id.* ¶ 12.) Considered in isolation, a phone tip reporting suspicious activity or an individual's presence near railroad tracks do not constitute reasonable suspicion. However, "all the facts taken together support a reasonable suspicion of wrongdoing." *Lee*, 916 F.2d at 819.[2]

---

[1] Plaintiff asserts that Ms. Andrachick's tip was uncorroborated since her description of the individual near the Virginia RR Crossing did not perfectly match Plaintiff. In particular, Ms. Andrachick described an individual of mix-race, and Plaintiff is black. (Pl.'s Opp. at 14.) The Officer Defendants maintain that "[i]rrespective of Grice's race, based on his presence within the railroad crossing, by train tracks, while wearing a red shirt near a backpack and what appeared to be a remote control device, Sergeant McVeigh clearly had a right to detain" Plaintiff. (Officer Defs.' Reply at 3.) Because the record reflects that Sergeant McVeigh arrived at the Virginia RR Crossing shortly after Ms. Andrachick's telephone call, and given the overwhelming similarities between Ms. Andrachick's description and Sergeant McVeigh's observations of Plaintiff, the Court agrees with the Officer Defendants that Ms. Andrachick's tip was corroborated by Sergeant McVeigh. *See United States v. Muhammad*, 463 F.3d 115, 122 (2d Cir. 2006) ("[P]ersonal observations made by the officers that corroborate information" provided by a tipster "may provide the basis for a reasonableness finding.") Thus, it was permissible for Sergeant McVeigh to act upon Ms. Andrachick's tip, even in light of the fact that she did not definitively identify Plaintiff as black, given the other similarities between her description and Plaintiff's appearance and Plaintiff's location near railroad tracks holding a remote control device.

[2] An officer need only have reasonable suspicion that ***any*** criminal activity is afoot. (Officer Defs.' Mot. at 5); *see James v. Melendez*, 567 F. Supp. 2d 480, 484 (S.D.N.Y. 2008) ("The reasonable suspicion can be of any crime that the officer reasonably suspects was committed by the person who was stopped.") (citing *Sokolow*, 490 U.S. at 7.) As the Officer Defendants note, unlawful interference with a railroad train is a class D felony. (Officer Defs.' Opp at 6.) (citing N.Y. R.R. Law § 53-e).

Importantly, "[r]easonable suspicion entails [only] some minimal level of objective justification for making a stop . . . ." *Sokolow*, 490 U.S. at 2.

### B.  Placing in Handcuffs May Constitute Arrest

The Court next turns to the issue of whether the initial *Terry* stop of Plaintiff transformed into an arrest when Plaintiff was placed in handcuffs.  "A permissible investigative stop may become an unlawful arrest if the means of detention are 'more intrusive than necessary.'" *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (quoting *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993)).  "In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the 'amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.'" *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) (quoting *Perea*, 986 F.2d at 645).  "[I]ntrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Vargas*, 369 F.3d at 102 (internal citations and quotation marks omitted).

Here, the Officer Defendants assert that Sergeant McVeigh's use of handcuffs to detain Plaintiff was reasonable (i) to protect Plaintiff from being struck by a train or touching the electrified third rail; (ii) to protect the safety of Sergeant McVeigh, and other arriving officers, from potential explosive devices; and (iii) to facilitate the orderly completion of the officers' investigation.  (Officer Defs.' Mot. at 10.)  Plaintiff counters that no "legitimate safety concerns" necessitated putting Plaintiff in handcuffs.  (Pl.'s Opp. at 18) (citing *United States v. Polanco*,

12

No. 10-cr-627 (RPP), 2011 WL 240140, at *7 (S.D.N.Y. Jan. 19, 2011).

At the outset, the Court notes that the use of handcuffs is considered a "maximal intrusion under the Fourth Amendment." *Polanco*, 2011 WL 240140, at *7 (citing *United States v. Ceballos*, 654 F.2d 177, 180–81, 184 (2d Cir. 1981). Here, it appears that Plaintiff was placed in handcuffs after Sergeant McVeigh patted down Plaintiff and discovered that Plaintiff had no weapons on his person. (Pl.'s 56.1 ¶ 17; Klein Decl., Ex. 11 at 6:10–14.) Additionally, Plaintiff informed Sergeant McVeigh that he was at the Virginia RR Crossing taking pictures because he is a rail fan. (Klein Decl., Ex 11 at 5:20.) Sergeant McVeigh confirmed this when he discovered the email from the MTA in Plaintiff's backpack granting Plaintiff permission to take pictures of the trains. (Officer Defs.' 56.1 ¶ 21.) Though the Officer Defendants attempt to argue that the situation was "swiftly developing," thus requiring the use of handcuffs, given Plaintiff's innocent explanation for his presence at the Virginia RR Crossing and Sergeant McVeigh's confirmation that Plaintiff had no weapons on his person, the Court rejects such a characterization of the underlying events. (Officer Defs.' Mot. at 11.)[3] Moreover, that Plaintiff remained in handcuffs even after MTA Officer Hosein recognized Plaintiff as a rail enthusiast tends to suggest that Plaintiff's detention was overly intrusive. (Officer Defs.' 56.1 ¶ 37.) Finally, the length of time of Plaintiff's restraint in handcuffs –45-50 minutes until the MTA personnel arrived—is not so short as to support the Officer Defendants' contention that Plaintiff's detention was not an arrest. (Officer Defs.' 56.1 ¶ 39.) Under these circumstances, there are material issues of fact that preclude the Court from granting summary judgment in favor of the Officer Defendants.

---

[3] The Officer Defendants correctly point out that an officer is not bound to accept as true a suspect's innocent explanation. (Officer Defs.' Mot. at 5–6) (citing *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989). Nevertheless, an innocent explanation, coupled with an absence of any weapons, would not appear to give rise to the sort of situation in which an officer must quickly react with the use of handcuffs.

### C.  Qualified Immunity

"Under federal law, a police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was "objectively reasonable" for his to believe that his actions were lawful at the time of the challenged act.'"  *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (quoting *Cerrone v. Brown*, 246 F.3d 194, 1999 (2d Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) and citing *Anderson v. Creighton*, 482 U.S. 635, 641 (1987)).  Similarly, New York law provides that an objectively reasonable probable cause determination on the part of the officer warrants dismissal of a plaintiff's false arrest claim at the summary judgment stage.  *Molina v. City of New York*, 28 A.D.3d 372, 373 (1st Dep't 2006).  "Thus, under both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable."  *Jenkins*, 478 F.3d at 88.  "If, however, on the undisputed facts the officer would be unreasonable in concluding probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims."  *Id.*

Here, genuine disputes of material fact preclude a grant of summary judgment in the Officer Defendant's favor on the basis of probable cause with respect to both Plaintiff's New York and federal false arrest claims.  *See Washington v. Flaherty*, No. 13-cv-8839 (LTS) (DCF), 2015 WL 3404176, at *3 (S.D.N.Y. May 27, 2015).  In particular, this Court cannot say as a matter of law that it was objectively reasonable for Sergeant McVeigh to place Plaintiff in handcuffs.  *See supra* Section II.B.  Moreover, at the summary judgment stage, the Court must construe the facts in favor of the non-moving party (here, Plaintiff).  *Dallas Aerospace, Inc. v.*

*CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Therefore, the Court declines to grant summary judgment in favor of the Officer Defendants on Plaintiff's false arrest claims.

**III.    Failure to Intercede Claim (Sixth Cause of Action)**

The Court next turns to Plaintiff's failure to intervene claims against Sergeant McVeigh and Lieutenant Farina.  "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (internal citations omitted).  An officer is only liable for a failure to intercede if there was "a realistic opportunity to intervene to prevent the harm from occurring."  *Id*.  Additionally, "[w]hether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonably jury could  not possibly conclude otherwise."  *Id*.  "Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997).

The Officer Defendants maintain that summary judgment should be granted with respect to Plaintiff's failure to intervene claim because (1) Plaintiff fails to identify which of the named defendants allegedly failed to intervene and (2) Sergeant McVeigh's alleged misconduct did not violate the U.S. Constitution.  (Officer Defs.' Mot. at 28–29.)  With respect to the Officer Defendant's first argument, a failure to identify individual officers responsible for the failure to intervene can be fatal to a plaintiff's claim.  *See Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 399 (S.D.N.Y. 2009) (granting summary judgment on plaintiff's failure to intervene claim

because plaintiff neglected to identify individual officers).  Nevertheless, the Court declines to grant summary judgment on this ground and will broadly construe Plaintiff's amended complaint so as to make out a claim against the Officer Defendants.  With respect to the Officer Defendant's second challenge to the failure to intervene claim, where a court has already determined that material issues of fact exist as to whether a plaintiff's constitutional right was violated, courts typically decline to grant summary judgment on associated failure to intervene claims.  *See, e.g.*, *Richardson v. Providence*, No. 09-cv-4647 (ARR) (LB), 2012 WL 1155775, at *4 (E.D.N.Y. Apr. 6, 2012) ("Because defendants' only basis for dismissing plaintiff's claims for failure to intervene against Officer Dyal is that plaintiff cannot establish a violation of any constitutional right, and this court has found that a material issue of fact exists as to whether a plaintiff was unreasonably detained, the claim against Officer Dyal also cannot be dismissed on this ground.").  Since the Court already determined that questions of fact predominate as to whether Plaintiff's initial detention ripened into an unlawful arrest, it declines to grant summary judgment in the Officer Defendant's favor on Plaintiff's failure to intervene claim.

## IV.   Supervisory Liability (Seventh Cause of Action)

Plaintiff's next claim is for supervisory liability as against Lieutenant Farina.[4]  Though *respondeat superior* liability does not exist under Section 1983, "[a]n individual supervisor can be liable . . . if the plaintiff establishes the 'defendant's personal involvement in the alleged constitutional deprivation.'"  *Carpenter v. City of New York*, 984 F. Supp. 2d 255, 268 (S.D.N.Y. 2013), *certificate of appealability denied* (Feb. 13, 2014) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d. Cir. 2013)).  "The personal involvement of a supervisory defendant may

---

[4] Plaintiff voluntarily withdraws his supervisory liability claim as against Sergeant McVeigh.  (Pl.'s Mot. at 29.)

be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[5]

Plaintiff contends that Lieutenant Farina's personal involvement in his unconstitutional arrest includes Lieutenant Farina's authorization of Sergeant McVeigh's continued detention of Plaintiff and his personal interrogation of Plaintiff.  (Pl.'s Mot. at 30.)  In fact, Lieutenant Farina testified during his deposition that he authorized Sergeant McVeigh to keep Plaintiff in handcuffs.  (Klein Decl., Ex. 4 at 118:19–22.)  The Court finds that such conduct may establish direct participation in the alleged constitutional violation, precluding a grant of summary judgment in favor of the Officer Defendants on Plaintiff's supervisory liability claim.

---

[5] Following the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), courts in this Circuit have disagreed as to whether all five methods of demonstrating personal involvement, as announced in *Colon*, remain viable.  *Compare Rivera v. Metro Transit Auth.*, 750 F. Supp. 2d 456, 462 (S.D.N.Y. 2010) and *Bellamy v. Mt. Vernon Hosp.*, No. 07-cv-1801, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009) (determining that only the first and partially third *Colon* categories survived *Iqbal*) *with Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) and *Qasem v. Toro*, 737 F. Supp. 2d 147, 151 (S.D.N.Y. 20120) (holding all five *Colon* categories apply post-*Iqbal*).  Here, since Lieutenant Farina arguably was personally involved due to his direct participation, which courts generally agree still satisfies the personal involvement requirement, this Court will refrain from further commentary on the viability of the *Colon* categories.

## V.     Assault and Battery (Tenth and Eleventh Causes of Action)

The Court next turns to Plaintiff's assault and battery claims.[6]  While an assault is "an intentional placing of another person in fear of imminent harmful or offensive contract," battery constitutes the "intentional wrongful physical contact with another person without consent." *Lederman v. Adams,* 45 F.Supp.2d 259, 268 (S.D.N.Y.1999) (quoting *Charkhy v. Altman,* 678 N.Y.S.2d 40, 41 (1st Dep't 1998) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105 (2d Cir.1993)).  "If an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest."  *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001) (collecting cases).  Courts have determined assault and battery claims to be viable where there is an unlawful arrest.  *See, e.g., Budgar v. State*, 98 Misc. 2d 588, 591–92 (Ct. Cl. 1979).  Having already concluded that summary judgment is inappropriate at this stage on Plaintiff's false arrest claim, the Court declines to grant summary judgment on Plaintiff's claims for assault and battery.

## VI.     Claims Against the Town of Greenburgh

Finally, the Court turns to Plaintiff's claims against the Town of Greenburgh.  In his brief in opposition to the Town of Greenburgh's Motion for Summary Judgment, Plaintiff voluntarily withdraws his claim for municipal liability under 42 U.S.C. § 1983.  (Pl.'s Town Opp. at 8.) Furthermore, the Town of Greenburgh concedes in its reply brief that it is liable for any state law torts committed by individual defendants in its employ pursuant to *respondeat superior*.  (Reply

---

[6] The Officer Defendants contend that this Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.  (Officer Defs.' Mem. at 32–33.)  However, where a plaintiff's federal claims survive summary judgment and their state law claims "are so related to claims in the action within [the Court's federal question] jurisdiction that they form part of the same case or controversy under Article III," a Court may properly retain supplemental jurisdiction over a plaintiff's state law claims.  *Sankar v. City of New York*, 867 F. Supp. 2d 297, 313 (E.D.N.Y. 2012) (quoting 28 U.S.C. § 1367(a)).

Memorandum of Law in Support of the Town of Greenburgh's Motion for Summary Judgment at 2.) Since the Court declines to grant summary judgment in favor of the Officer Defendants on Plaintiff's state law claims, it similarly declines to grant summary judgment in favor of the Town of Greenburgh.

## CONCLUSION

For the foregoing reasons, the Officer Defendants' and Town of Greenburgh's motions for summary judgment are DENIED. The Court respectfully directs the Clerk to terminate the motions at ECF Nos. 104 and 112. The parties are directed to appear for an in-person pretrial conference on January 29, 2016 at 12:15 p.m. The parties may wish to contact the Court for the purpose of referring the matter to a magistrate judge to facilitate possible disposition prior to trial.

Dated:    December 7, 2015
          White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge